### UNITED STATES of America

v.

### Johnnie L. PETERSON, Appellant.

### No. 73–1168.

United States Court of Appeals, District of Columbia Circuit.

Argued March 6, 1974.

Decided Dec. 27, 1974.

---

**18.** Joyce v. United States, 147 U.S.App.D.C. 128, 137, 454 F.2d 971, 980 (1971), cert. denied, 405 U.S. 969, 92 S.Ct. 1188, 31 L.Ed.2d 242 (1972).

Howard P. Willens, Washington, D. C., with whom William T. Lake, Washington, D. C. (both appointed by this Court), was on the brief for appellant.

Michael G. Scheininger, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty. at the time the brief was filed, and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee. Earl J. Silbert, Washington, D. C., also entered an appearance for appellee.

Before TAMM, LEVENTHAL and ROBINSON, Circuit Judges.

TAMM, Circuit Judge:

Appellant challenges his conviction for first degree murder on three grounds.

First, he contends that the prosecution failed to produce sufficient evidence of premeditation and deliberation and that the jury was erroneously charged on those elements. Second, he asserts that the trial court committed plain error by admitting a reference to appellant's prior criminal record without a cautionary instruction. Finally, he argues that the jury instruction given as to the question of whether appellant's abnormal mental condition negated the required intent for first degree murder was prejudicial. While we express some dissatisfaction with the latter jury instruction, we find no basis for reversal and hence, affirm.

## I

Around midnight on July 27, 1971, decedent Charles Sanders and his friend Jay Washington went out to get something to eat. While walking, they met appellant Peterson who spoke briefly with Sanders. During their meal, Sanders wrote his address on a piece of paper, which Washington later saw him give to Peterson. Tr. 92–93. Soon thereafter, the pair separated, Sanders, having asked Washington to telephone him later to see if he "was all right", walked in the direction of his apartment. Sanders, an admitted homosexual, had on previous occasions asked Washington to telephone him "when he was going home with someone." Tr. 107, 111. At 3:00 a.m., Washington telephoned Sanders, who indicated that Peterson was with him.

Sanders' body was found in the bathtub of his apartment by a building employee two days later; a butcher knife was still embedded in his chest. He had been stabbed twice, once in the back and once in the chest which had caused the more severe injury. Tr. 30, 36–37. A trail of blood was discovered leading from the living room to the bathroom, and a glass by Sanders' bed yielded a fingerprint which was later determined to belong to appellant.

On August 16, 1971, Peterson was arrested as he fled from the scene of a street robbery. Taken to the stationhouse and advised of his rights, appellant became nervous at the mention of fingerprinting and blurted out, "As soon as you fingerprint me, you got me. I want to talk to somebody from homicide. I killed a man." Tr. 117. Peterson then confessed to Officer Ronald Norton that he had gone to decedent's apartment and, while there, went into the kitchen and procured a butcher knife. Appellant concealed the knife and "walked around a little bit." Tr. 118. When Sanders turned his back to him and bent over the bed, Peterson stabbed him once by the spine. At Peterson's command the decedent staggered to the bathroom where appellant ordered him to turn around and then stabbed him in the chest. Asked to explain his reason for the killing, Peterson told Officer Norton that Sanders "had made fun of him when he was with his women." Tr. 119.

Appellant was next transported to the homicide squad office, where he gave a written statement. He stated that he had known Sanders "about two or three months" and on the night of his death had met Sanders "and another sissy." He recounted that he and Sanders had been unobserved entering the apartment building except by "the man behind the front desk, but he did not pay any attention to us." Tr. 132–33. The statement then contained the following description of the crime:

> He [Sanders] wanted me because he was sissy. I told him that he would have to pay for it. At this time I told him that he would have to pay me. He stated that he did not pay anyone.
>
> I then told him that he must not want me if he did not want to pay for it. Then I got up off the bed and started walking around and thinking. Then I went into the kitchen and got a butcher knife. I stuck [it] into my pants so he could not see it and went back into the bedroom. He was bending down fixing his shoe. At this time I stabbed him in the back. The knife went all the way through.
>
> Then I took it out. I then told him to go over and stand by the bathroom. He could hardly make it over there,

but he did as I told him. He was standing up in the doorway to the bathroom, and I stabbed him again. I think it was under his heart. I left the knife in him that time. At this time he fell in the bathtub.

Tr. 133.

At trial, the only disputed issue was whether Peterson had premeditated and deliberated the killing. The defense presented one witness, Dr. Harold Kaufman, a psychiatrist. He testified that he had interviewed appellant and his mother and had reviewed reports on Peterson by other experts. Dr. Kaufman's primary conclusion was that Peterson "was suffering from an explosive personality disorder" which left him unable to premeditate and deliberate under the circumstances of the killing. Tr. 233.

Under cross-examination, Dr. Kaufman retracted some of his testimony[1] and admitted that previous psychiatrists in 1968 had found their initial diagnosis was erroneous and that Peterson had faked mental illness. Tr. 252–55. In rebuttal the government presented another psychiatrist, Dr. Robert Robertson of Saint Elizabeth's Hospital who testified that he had examined Peterson and opined that at the time of the offense appellant "was not suffering from any mental disorder". Tr. 321. Dr. Robertson expressed disagreement with Dr. Kaufman's finding that Peterson suffered the "mental disorder of explosive personality," both because his symptoms were inconsistent with that diagnosis and because "all people who committed criminal offenses" possessed explosive personalities and it was not at all a "substantial mental disorder".

The jury returned a guilty verdict of murder in the first degree. Appellant was sentenced to life imprisonment and this appeal followed.

## II

Appellant's first contention is that the trial judge erred in denying his motion for judgment of acquittal for first degree murder because of the insufficiency of the government's proof as to premeditation and deliberation. Appellant places primary reliance on our decisions in Austin v. United States, 127 U.S.App. D.C. 180, 382 F.2d 129 (1967) and Hemphill v. United States, 131 U.S.App.D.C. 46, 402 F.2d 187 (1968) for the proposition that in first degree murder cases the jury cannot be left impermissibly free to speculate about the defendant's mental processes at the time of the offense. He then argues that the government failed to introduce any evidence which took the issue out of the realm of speculation. We disagree.

Our starting point is the distinction between the quantum of proof required for submission of the charge to the jury and that which is necessary for conviction. To grant a motion for acquittal, the court must find that when viewed in the light most favorable to the government, the evidence is such that a reasonable juror *must* have a reasonable doubt as to the existence of any of the essential elements of the crime.[2] *See, e. g.*, United States v. Bethea, 143 U.S.App. D.C. 68, 70, 442 F.2d 790, 792 (1971); United States v. Sutton, 138 U.S.App. D.C. 208, 216, 426 F.2d 1202, 1210 (1969); Austin v. United States, *supra*, 382 F.2d at 138.

Under the District of Columbia first degree murder statute, 22 D.C.Code § 2401 (1973) those essential elements include deliberation and premeditation.

1. Dr. Kaufman had testified in direct examination that the St. Elizabeth's Hospital reports indicated that appellant in 1968 had been suffering from a schizophrenic reaction from which he "had sufficiently recovered so that he was released." Tr. 215.

2. The correctness of the trial court's denial of a motion for acquittal must be reviewed on the basis of the evidence as it stood at the close of the government's case. A defendant who puts on a defense after denial of such a motion does not waive his challenge. *See, e. g.*, United States v. Sutton, 138 U.S.App.D.C. 208, 217, 426 F.2d 1202, 1211 n. 67 (1969); Belton v. United States, 127 U.S.App.D.C. 201, 203, 382 F.2d 150, 152 n. 2 (1967); Austin v. United States, 127 U.S.App.D.C. 180, 189, 382 F.2d 129, 138 n. 20 (1967).

We have noted previously that Congress attempted through these elements to establish a demarcation between the degrees of homicide, which we must strive to preserve. *See* Austin v. United States, *supra.* Consequently, the government must introduce facts which provide proof beyond a reasonable doubt that a crime was committed not merely intentionally, in sustained frenzy or heat of passion, but with premeditation and deliberation. *Id.* at 140. As Judge Leventhal wrote in Hemphill v. United States, *supra,* 402 F.2d at 191:

> Premeditation and deliberation are facts, susceptible of proof like any other facts in a criminal trial. The jury is not supposed to be rendering a moral judgment of culpability based on whether it likes the defendant, or is horrified by the brutality of his killing. Whatever the difficulties of proving states of mind . . . the law now puts the burden of proving premeditation and deliberation on the prosecutor
>
> . . . . .

Judge Leventhal correctly identified the problem in this area—the difficulty of adducing proof as to a state of mind. The statutory elements require courts to hold the government to its burden of proof, but it also allows the flexibility to entertain probative circumstantial evidence from which to infer premeditation and deliberation. That is why in *Austin* and *Hemphill* we reversed first degree convictions where the government attempted to establish those elements primarily on the basis of the passage of sufficient time for premeditation and deliberation. Hemphill v. United States, *supra,* 402 F.2d at 191; Austin v. United States, *supra,* 382 F.2d at 139. That is also why in the absence of other evidence, we have focused on the fact of whether the defendant brought the murder weapon to the scene as highly probative of the requisite state of mind. *See* United States v. Brooks, 146 U.S.App.D.C. 1, 8, 449 F.2d 1077, 1084 (1971); United States v. Sutton, *supra,* 426 F.2d at 1212; Belton v. United States, 127 U.S.App.D.C. 201, 203, 382 F.2d 150, 152 (1967).

Moreover, we have held as sufficient to send the question to the jury evidence of "methodical preparation that reflected planning and premeditation," Parman v. United States, 130 U.S.App.D.C. 188, 399 F.2d 559, 569, cert. denied, 393 U.S. 858, 89 S.Ct. 109, 21 L.Ed.2d 126 (1968) and the passage of time *coupled* with certain overheard declarations by defendants, United States v. Mack, 151 U.S.App.D.C. 162, 167, 466 F.2d 333, 338, cert. denied, 409 U.S. 952, 93 S.Ct. 297, 34 L.Ed.2d 223 (1972).

■ In the instant case, the government introduced not circumstantial evidence but appellant's oral and written confessions as to the circumstances surrounding and his state of mind during the crime. Peterson orally admitted to a police officer that he killed Sanders for ridiculing him when appellant was with women companions. In his written statement, Peterson confessed that after being told that Sanders would not pay, he "got up off the bed and started walking around thinking". He procured the butcher knife, secreted it, waited until decedent's back was turned, and then stabbed him. These facts clearly are probative of a determination to kill reached calmly sometime before the act and of reflection upon the preconceived design to kill, turning it over in the mind. *See* United States v. Sutton, *supra;* Austin v. United States, *supra.* Further, the actual sequence of the killing, the waiting until Sanders' back was turned and the ordering of the wounded man into the bathroom where the second, fatal blow was struck evidences "methodical preparation" reflecting planning and premeditation. *See* Parman v. United States, *supra.*

Appellant responds to these statements by arguing that Peterson's reference to Sanders mocking of him in front of women was "a wisp of testimony [which] 'serves to raise doubts rather than resolve them.'" Appellant's Br. at 26, *citing* Hemphill v. United States, *supra,* 402 F.2d at 190. He argues that the incident is neither fully explored nor corroborated and is a "flimsy foundation" for a jury verdict. *Id.* at 26–27. In

rebutting the written confession, appellant asserts that the version detailed there contradicts the governments' theory. Instead, the statement, he argues, paints a clear portrait of a crime committed by a man lashing out on impulse, not by premeditation and deliberation. *Id.* at 27–28. Appellant concludes that "[t]hese fragments of evidence, contradictory as well as inconclusive, cannot sustain the prosecutor's *heavy* burden of proof." *Id.* at 29 (emphasis added).

Like the trial judge and the jury, we fail to see how appellant's admissions do not contain any evidence of the mental elements in question. In any event, appellant's argument misconceives the distinction between the government's burden of proof to withstand a motion for acquittal and its heavy burden to prove each element of the offense beyond a reasonable doubt. We see no reason to disturb the trial court's implicit finding that the evidence when viewed in the light most favorable to the government, is not such that a reasonable juror must have a reasonable doubt. The issue was properly left to the jury, which rendered its verdict.

■ Appellant next asserts that the trial court's jury instruction was erroneous in equating premeditation with intent to kill and constituted plain error. The trial court's first degree murder instruction was given verbatim from the book of recommended instructions published by the District of Columbia Bar Association.[3] However, appellant argues that by equating premeditation with intent to kill the trial court effectively blurred the demarcation between first and second degree murder established by Congress and recognized by this court in *Austin.* Appellant's Br. at 34. While conceding that this often invoked instruction has been generally upheld by the Supreme Court in Fisher v. United States, 328 U.S. 463, 470, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946) and by this court in *Austin* and United States v. Bryant, 153 U.S.App.D.C. 72, 79, 471 F.2d 1040, 1046 (1972), appellant contends that the objectionable portion was never specifically considered in those cases.

We find appellant's argument without merit. The instruction defines premeditation as "the *formation* of the intent to kill" (emphasis added). Moreover, this court in United States v. Sutton defined premeditation with the jury instruction attacked here. 426 F.2d at 1211.[4] In

---

3. The trial court charged:

    To establish Element No. 4, the government, again, must do this beyond a reasonable doubt, and it must show that the defendant, in so injuring the deceased, ha[s] acted after premeditation.

    What is premeditation?

    Premeditation is the formation of the intention or plan to kill, the formation of a positive design to kill. To premeditate is to think of the act before doing. Premeditation involves giving thought before acting to the idea of taking a human life and reaching a definite decision to kill. In short, premeditation is the formation of specific intent to kill.

    The last element involves deliberation. Here, again, the government must show beyond a reasonable doubt that the defendant Johnnie L. Peterson, in so injuring the deceased, ha[s] acted with deliberation.

    Deliberation involves giving consideration and reflection upon the preconceived design to kill, turning it over in his mind, and giving it a second thought.

    Although premeditation, which is the formation of a design to kill, may be instantaneous, as quick as thought itself, it is necessary that an appreciable time elapse between formation of the design and the fatal act within which there is, in fact, deliberation.

    The law prescribes no particular period of time. It necessarily varies according to the circumstances of each case. Consideration of the matter may continue over a prolonged period, hours, days, or even longer.

    Then, again, ladies and gentlemen, it may cover a span of mere minutes.

    If one forming an intent to kill does not act instantly, but pauses and actually gives a second thought in connection with the intended act, he has, in fact, deliberated. It is the fact of deliberation that is essential, rather than the length of time that it may have continued.

    Tr. 365–66.

4. In fact, Judge Robinson cited both *Austin* and *Fisher* as support for the definition. United States v. Sutton, *supra,* 426 F.2d at 1211, *citing* Austin v. United States, *supra,* 382 F.2d at 135 n. 12, *quoting instructions*

Belton v. United States, we did not find plain error in a briefer charge than at issue here, a charge which basically instructed that premeditation was "the formation of the intent or plan to kill". 382 F.2d at 152–153. The *Belton* panel took into account that the instruction on premeditation was conjoined with the instruction on deliberation—requiring "reflection" and "further thought upon this plan . . . to kill." Similarly, the jury considering appellant's fate was charged on the need to show deliberation beyond a reasonable doubt, and instructed: "Deliberation involves giving consideration and reflection upon the preconceived design to kill, turning it over in his mind, and giving it a second thought." Tr. 366. In sum, we find neither prejudice nor plain error in the instructions given here.

## III

■ Appellant next asserts that the trial judge erroneously instructed the jury as to its leeway to consider whether defendant's abnormal mental condition negated his ability to form the requisite mental state for first degree murder. Appellant argues that the instruction given conflicted with our *en banc* opinion in United States v. Brawner, 153 U.S.App.D.C. 1, 30, 471 F.2d 969, 998 (1972), and constituted plain, prejudicial error. Since this is the first case to reach this court since the *Brawner* decision where the defendant has introduced evidence of an abnormal mental condition as tending to show that he did not possess the requisite mental state, we

should briefly review what *Brawner* established.[5] In *Brawner*, this court held that expert testimony may be received as competent evidence as to whether defendant had the specific mental state required for a particular crime.[6] *Id.*

We recognize that the receipt of this expert testimony requires "careful administration by the trial judge." As Judge Leventhal wrote in *Brawner*:

the judge may, and ordinarily would, require counsel first to make a proffer of the proof to be adduced outside the presence of the jury. The judge will then determine whether the testimony is grounded in sufficient scientific support to warrant use in the courtroom, and whether it would aid the jury in reaching a decision on the ultimate issues.

*Id.* at 1002 (footnote omitted).

■ To capsulize, the threshold issue therefore is the classic question of relevancy. As with any piece of evidence, the trial judge is called upon to weigh the probative versus the potential prejudicial nature of the evidence proffered. The judge must determine whether the evidence is sufficiently grounded in scientific fact and whether it directly addresses the mental element at issue so that its introduction will not unduly distract or mislead the jury from the determination it must make. *See generally* McCormick on Evidence §§ 184–85 (2d ed. 1972).

■ We, therefore, note with approval that the trial judge in the instant case

---

approved in Fisher v. United States, 328 U.S. 463, 469, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946).

**5.** We reject the government's suggestion that the "mental condition negating mental intent" doctrine is unsound and should be overruled, and we reaffirm our adherence to it. *See* Appellee's Br. at 24 n. 11.

**6.** That holding reversed a position dating back to 1946. In Fisher v. United States, 80 U.S. App.D.C. 98, 149 F.2d 28 (1945), we upheld the trial court's refusal to instruct the jury to "consider the entire personality of the defendant, his mental, nervous, emotional and physical characteristics as developed by the evidence of this case." The Supreme Court af-

firmed on the limited ground of disinclination to "force" on this court a legal doctrine for the District of Columbia. Fisher v. United States, *supra*, 328 U.S. at 476, 66 S.Ct. 1318. In the two *Stewart* opinions, we declined to reappraise the ban until further experience with the *Durham* rule was gathered. Stewart v. United States, 107 U.S.App.D.C. 159, 275 F.2d 617 (1960), rev'd on other grounds, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961); Stewart v. United States, 94 U.S.App.D.C. 293, 214 F.2d 879 (1954); *see* Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954). *See generally* United States v. Brawner, 153 U.S.App.D.C. 1, 31–34, 471 F.2d 969, 999–1002 (1972).

insisted on a proffer of defendant's medical testimony. Tr. 180–87. According to the record, the judge did receive some representations as to the medical conclusions to which the expert witness would testify. Tr. 187–91, 198–200. However, we find nowhere on the record any indication that defense counsel proffered the scientific basis for the witness' conclusions. We reiterate that only after receiving a complete proffer can the trial judge discharge the responsibilities that the *Brawner* opinion contemplated the administration of this rule demands.

■ Appellant contends that the instruction given on this issue constituted plain error. That instruction, which is reprinted below,[7] is a modification of the model insanity instructions set out in the *Brawner* opinion. 471 F.2d at 1008. Appellant argues that the instruction wrongly required the jury to find that the defendant had a "mental disease or defect" as defined in McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962) before they could consider the medical evidence, that the charge confused the jury by referring to the presumption of sanity, and that the instruction erroneously told the jury to decide

whether Peterson " 'was *incapable* of the premeditation and deliberation required for murder in the first degree.' " Appellant's Br. at 41–43 (footnote omitted).

We agree with appellant that the instruction was an unnecessarily elaborate application of what the *Brawner* rule required. The doctrine enunciated in *Brawner* does not require a jury to consider a new, additional determination necessitating detailed instruction. The jury in this situation has only one factual determination to make—whether the defendant deliberated and premeditated the killing.[8] What *Brawner* establishes is that the jury may now be aided in that determination by the receipt of competent medical evidence. When the rule is carefully administered by the trial judge, we think a simple, straight-forward instruction will suffice. As a model,[9] we believe the inclusion of a single sentence from the proposed *Brawner* insanity instruction in the standard first degree murder charge is satisfactory:

> In determining whether [premeditation and deliberation] has been proved beyond a reasonable doubt you may consider the testimony as to the defendant's abnormal mental condition.

7. The law provides that a jury shall return a verdict of not guilty of murder in the first degree if at the time of the criminal conduct the defendant, as a result of a mental disease or defect, was incapable of the premeditation and deliberation required for murder in the first degree.

Every man or woman is presumed to be sane, that is, to be without mental disease or defect, and to be responsible for his or her acts. But that presumption no longer controls, ladies and gentlemen, when the evidence is introduced that he may have a mental disease or defect.

Mental disease includes any abnormal condition of mind, regardless of its medical label, which substantially affects mental or emotional processes and substantially impairs behavior controls.

The term "behavior controls" refers to the processes and the capacity of a person to regulate and control his conduct and actions.

In considering whether the defendant had a mental disease at the time of the unlawful act here in this case, you may consider

testimony in this case concerning the development, adaptation and functioning of these mental and emotional processes and behavior controls.

The burden is on the government to prove beyond a reasonable doubt either (1) that the defendant was not suffering from a mental disease or defect, or that if he were suffering from a mental disease or defect, he, nevertheless, was capable of premeditating and deliberating.

Tr. at 373–74.

8. In discussing the rule in this context, we intimate no opinion as to its applicability to other mental elements. As we did in *Brawner*, we leave such determinations to future consideration where we will be aided by the availability of a specific factual context. *See* 471 F.2d at 1002 n. 75.

9. Appellant advances a California charge which instructs the jury in terms of "substantially reduced mental capacity." Appellant's Br. at 45 n*. We think this comes too close to the concept of "diminished responsibility", which we noted in *Brawner* to be misleading. *See id.* at 998.

471 F.2d at 1008. Coupled with the approved instruction on the role of an expert medical witness,[10] we think that such a procedure will adequately instruct the jury without undue confusion about the determination it must make.

While expressing dissatisfaction with the instruction given in this case, we do not believe it requires reversal. The instruction, while proposed by the prosecutor, was the subject of a conference between the prosecutor and defense counsel and after it was delivered to the jury, was approved by defense counsel. Tr. 4–5, 192, 198–99, 378. Appellant's first argument is that by incorporating the *McDonald* definition of medical disease, the instruction omits other medical evidence which the *Brawner* rule contemplated would be admissible.[11] We agree with appellant as to admissibility, for as our *Brawner* opinion explicitly stated: "For example, the defendant may offer evidence of mental condition not qualifying as mental disease under *McDonald*." 471 F.2d at 998.

However, we do not see how the instruction prejudiced this particular defendant. Appellant's expert witness testified that Peterson suffered from an explosive personality disorder that substantially affected his emotional and mental responses and distorted his behavior in a way that made him unable to premeditate and deliberate—a condition that would fall within the definition of mental disease given to the jury. Tr. 212, 233–34. The government attempted to impeach the basis of the expert's conclusion and in rebuttal called its own expert who opined that appellant "was not suffering from any mental disorder." Tr. 321. The question for jury resolution, therefore, did not revolve around wheth-

er Peterson's condition did or did not fall within the *McDonald* definition,[12] but around the credibility and weight to be given to the medical evidence. We find no plain error as regards this portion of the instruction.

As to appellant's argument on the instruction's reference to the presumption of sanity, while we agree that the paragraph is surplusage, we cannot find plain error in light of the instruction's directive that "the presumption no longer controls" when evidence of an abnormal mental condition is introduced. Appellant's final argument is that the charge instructs the jury in terms of whether Peterson was *incapable* of premeditation. We agree with appellant that the issue was whether appellant in fact premeditated, and the jury was so charged.

It is possible that the trial judge was influenced by a statement in *Brawner.* After discussing the possibility that an abnormal condition might not absolve a defendant of criminal responsibility (because he retained the capacity to control his behavior and appreciate the wrongfulness of his act), but yet might negate the mental state required for a particular crime, the *Brawner* opinion continued: "*e. g.*, if the abnormal mental condition existing at the time of the homicide deprived him of the capacity for the premeditation required for first degree murder." That reference to the abnormal condition negating capacity for premeditation at the time of the homicide was identified as an example, and was not meant to be exhaustive.

An abnormal mental condition may influence the probability that a defendant premeditated and deliberated—and so be taken into account by a jury in determining whether those states of mind ex-

10. Such an instruction was given in this case, Tr. 204–10, in the form suggested by Washington v. United States, 129 U.S.App.D.C. 29, 39–43, 390 F.2d 444, 457–58 (1967).

11. In *McDonald*, we established that a mental disease or defect "includes any abnormal condition of the mind which substantially . . . impairs behavior controls." McDonald v.

United States, 114 U.S.App.D.C. 120, 312 F.2d 847, 851 (1962).

12. In fact, appellant's trial counsel proffered to the court that his expert would testify to mental illness which would fall within the *McDonald* definition, but could not testify to "productivity", another component of the *Brawner* insanity test. Tr. 190.

isted in fact (beyond a reasonable doubt) —even though it did not eliminate the capacity for premeditation. This problem would be eliminated by use of the simple instruction set out above.

■ However, we cannot say the charge as given constituted plain and prejudicial error. In the instant case, the key testimony of defendant's expert witness was that in view of defendant's abnormal mental condition, he did not think defendant "was *able* to premeditate and deliberate." Tr. 233. The charge tracked that testimony. No request or objection brought into focus the particular issue now relied upon. Under the circumstances, we do not think this presents a case of prejudicial error in which the instruction detoured the jury from the ultimate factual issue.

We think our conclusion that the instruction did not constitute plain error is buttressed by what we perceive is appellant's failure even to point to such error in the record. Appellant argues that

> if this Court strains to find that the errors in the charge were nonprejudicial, it will forego the opportunity to establish clearly what the proper instruction should be for use in future cases involving similar use of medical testimony.

Appellant's Reply Br. at 18. We hope that our discussion of the *Brawner* rule will aid the trial court judges who must administer it. We believe that we have established the type of instruction contemplated by that rule. To do so, however, does not require reversal of this conviction when faced with a record that reveals the absence of plain error or prejudice to the defendant.

## IV

Finally, we briefly dispose of appellant's final argument that the trial court committed plain error by admitting without a cautionary instruction testimony relating to Peterson's prior criminal activity.[13] The challenged testimony was given by the defense's own expert witness, Dr. Kaufman. In relating the basis for his medical conclusion, the witness referred to, as one source for his diagnosis, previous hospital reports made during a period where Peterson was confined after a non-guilty verdict for reasons of insanity. On cross-examination, the witness revealed that the reports indicated that Peterson had been "malingering" and that he had never had any disorder during the time of confinement or at the time of the 1968 crime. Tr. 252–55; *see* note 1 *supra*, and accompanying text.

■ This testimony was clearly relevant and admissible both to apprise the jury of the factual foundation for the witness' conclusion and as evidence as to the credibility of that diagnosis. *See* United States v. Bennett, 148 U.S.App. D.C. 364, 368, 460 F.2d 872, 876 (1972). The testimony was obviously elicited for that reason; in no way did it impeach the defendant. In fact, the defendant never did testify at trial. Consequently, this situation is simply outside the rationale of the rule enunciated in the *Jones* and *McClain* cases, where we held that the failure to give a cautionary instruction was plain error where prior crime evidence was admitted for impeachment of the defendant or to show malice. *See* United States v. McClain, 142 U.S.App.D.C. 213, 440 F.2d 241 (1971); Jones v. United States, 128 U.S.App.D.C. 36, 385 F.2d 296 (1967).

In sum, we have examined carefully each of the arguments that appellant has ably raised, but find that none of them give cause for reversal. The judgment, therefore, is

Affirmed.

---

**13.** Appellant's trial counsel neither attempted to exclude the testimony nor requested a limiting instruction. Appellant's Br. at 47 n*.