## PIETCH v. UNITED STATES.
### No. 1903.

Circuit Court of Appeals, Tenth Circuit.
March 18, 1940.

Rehearing Denied April 8, 1940.

Writ of Certiorari Denied June 3, 1940.

See 60 S.Ct. 1100, 84 L.Ed. ——.

Paul Pinson, of Tulsa, Okl. (Roy St. Lewis and John J. Sirica, both of Washington, D. C., on the brief), for appellant.

John Brett, Asst. U. S. Atty., of Oklahoma City, Okl. (Charles E. Dierker, U. S. Atty., of Oklahoma City, Okl., and James J. Waters, Sp. Asst. to Atty. Gen., on the brief), for appellee.

Before BRATTON and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

Earl R. Ernsberger, George R. Pietch, P. A. Janeway, C. Paul Laubenheim, and fifteen others were jointly indicted in sixteen counts. Counts one to fifteen, inclusive, being substantive counts drawn under

section 215 of the Criminal Code, 18 U.S.C.A. 338, each charged a scheme to defraud through the sale of stock in Western Service Corporation, and the specific use of the mails in furtherance thereof; and count sixteen, drawn under section 37 of the Criminal Code, 18 U.S.C.A. 88, charged a conspiracy to use the mails for such purpose. The case was dismissed as against all defendants except the four named. On account of serious illness Ernsberger was not brought to trial. Pietch, Janeway and Laubenheim were tried together. Pietch was convicted on five counts including the sixteenth and acquitted on six, and Janeway and Laubenheim were each convicted on eight including the sixteenth and acquitted on three. Pietch was sentenced on the first count to pay a fine of one thousand dollars and costs, and he was placed on probation for a period of two years on the other counts on which he was found guilty on condition that the fine and costs be paid within one year. The record fails to disclose the action of the court in respect to the imposition of sentence upon Janeway and Laubenheim. Pietch appealed.

 The contention is made that it was prejudicial to the rights of appellant to be tried more than seven years after the termination of the transactions on which the indictment was predicated. The indictment was returned before limitation had run. The United States Attorney stated in person and by letter to counsel for some of the accused that he did not intend to try the case, and that it was his purpose to dismiss it. But appellant never made demand for trial. He did not object or protest to the court respecting the delay. He filed a motion to dismiss the indictment on account of the delay, but the motion was filed more than three years after the return of the indictment, and it was a motion to dismiss—not a demand for trial. A person charged with a crime cannot assert with success that his right to a speedy trial guaranteed by the Sixth Amendment to the Constitution of the United States has been invaded unless he asked for a trial. In the absence of an affirmative request or demand for trial made to the court it must be presumed that appellant acquiesced in the delay and therefore cannot complain. Phillips v. United States, 8 Cir., 201 F. 259; Worthington v. United States, 7 Cir., 1 F. 2d 154, certiorari denied 266 U.S. 626, 45 S.Ct. 125, 69 L.Ed. 475; Frankel v. Woodrough, 8 Cir., 7 F.2d 796; Daniels v. United States, 9 Cir., 17 F.2d 339, certiorari denied, 274 U.S. 744, 47 S.Ct. 591, 71 L.Ed. 1325; Poffenbarger v. United States, 8 Cir., 20 F.2d 42, certiorari denied, Poffenbarger v. Aderhold, 290 U.S. 703, 54 S.Ct. 375, 78 L.Ed. 604; Collins v. United States, 8 Cir., 20 F.2d 574; O'Brien v. United States, 7 Cir., 25 F.2d 90; State v. Callahan, 119 Wash. 535, 206 P. 13; State v. Bohn, 67 Utah 362, 248 P. 119; State v. McTague, 173 Minn. 153, 216 N.W. 787; People v. Foster, 261 Mich. 247, 246 N.W. 60; Raine v. State, 143 Tenn. 168, 226 S. W. 189.

 The further contention is that the evidence was insufficient to support the verdict and judgment. In connection with such contention appellant seeks to invoke the familiar rule that where all of the substantial evidence is just as consistent with innocence as with guilt, a conviction cannot be sustained. Substantial evidence was submitted which warranted the jury in finding these facts: Ernsberger had purchased and developed a public utility in Oklahoma, and then lost control of it. Janeway had been in the banking business in that state for many years. Appellant had been engaged for a long time in the securities and investment business in Binghamton, New York, and he had been associated with Ernsberger, J. M. Henry, Dean M. Stacy, and D. W. Ohern in the ownership of Income Shares Corporation, a company engaged in the oil and gas royalty business in Oklahoma. In March, 1930, these five persons met in Oklahoma City and conferred in respect to the organization of a new company to engage primarily in the business of dealing in oil and gas royalties. As the result of the conference, Western Service Corporation, hereinafter called the company, was organized. Each of the five individuals paid in one thousand dollars and that was the capital with which the company was incorporated. Appellant subsequently purchased 1,000 shares of preferred and 100,000 shares of common stock for which he paid $29,000. Ernsberger also purchased 100,000 shares of common stock. Both appellant and Ernsberger paid one cent per share for the common stock and Pietch later sold some of his for one dollar per share. Although the company was organized for the primary purpose of dealing in oil and gas royalties it was decided to enter the radio business. A subsidiary corporation was formed for that purpose and money of the parent in excess of $25,000 was lost in that venture. Appellant was appointed fiscal agent of the com-

pany to dispose of 50,000 shares of its preferred stock on a commission of fifteen per cent. The agreement was amended to provide that he should pay all expenses in connection with the sale of such stock for which he was to receive an additional fifteen per cent. The agreement was later terminated by mutual agreement, and Earl R. Ernsberger & Company was thereafter appointed fiscal agent for the sale of all preferred stock on a commission of ten per cent of the sale price. The offices of the two companies were in the same building and there was partial identity of management and employees. Appellant brought some stock salesmen from the East, and he and Ernsberger sought and induced Laubenheim to become associated with the company as sales manager. Ernsberger and appellant dominated the company. It was determined to enter in the utility business. All of the outstanding stock of Commercial Gas Pipe Line was purchased for $200,000, and that was a fair value for the properties of that corporation. But they were immediately set up on the books of the purchasing company at the fictitious value of $454,816.92. A gas franchise was obtained from the City of Guthrie and a distribution system was constructed and operated for a short time. A like franchise was obtained from the City of Shawnee but no distribution system was constructed to completion or operated. Henry, Stacy and Ohern retired from the company when it thus entered a different business from that contemplated at the outset. Newspaper publicity used in securing the franchise at Guthrie, prospectuses, pamphlets, folders, and communications addressed to stockholders contained false statements and representations, and untrue statements and representations were made to prospective purchasers of stock. Reference was made in newspaper publicity to the capitalization of the company being $19,000,000, but it never had assets remotely approaching such figure. A photograph of J. E. Braniff, was displayed and he was listed under the heading "Management" with the statement that he was a state civic and business leader, owner of the Braniff Building in Oklahoma City, and a widely known insurance executive. He was never connected with the company in any manner. Sales meetings were held about once a month for the purpose of stimulating enthusiasm. Talks were made concerning the progress of the company and its condition. Appellant attended some of these meetings. Written circulars were furnished salesmen for use in making sales of stock. One contained the statement that the earnings for the ensuing year were conservatively estimated at more than twice the dividend requirements of that offering of preferred stock. Some of the salesmen had in and about the offices copies of the publicity containing the picture of Braniff and the statement that he was connected with the management of the company. Some purchasers of stock were told that Braniff was connected with the company, and one was shown his picture. One was shown a photographic copy of a check for $50,000 signed by Ernsberger and was told that it was for stock. Others were told that there was a long waiting list for stock and that stock could be cashed at any time. One was told that the company had money in the East; another that the stock was backed by bankers in New York; and a third that the resident Bishop of the Catholic Church had the money of the church invested in the company. One was told that the company was worth a million dollars and was making money, and another that the property of the company was paid for and could be sold for double the amount the stockholders had invested in it. Still another was told that Ernsberger had invested $250,000 in the company; that appellant, Janeway and Laubenheim each had invested $50,000; that the property in Kansas produced an annual gross return of $500,000 and a net of $300,000; and that the company had about $250,000 cash in hand and in bank. An application filed in Kansas for authority to sell stock in that state contained the statement that Ernsberger had invested $27,250, owned 100,000 shares of common stock, and was worth $1,000,000; that appellant had invested $44,750, owned 73,000 shares, and was worth $500,000; that Janeway had invested $20,000, owned 5000 shares, and was worth $1,000,000; that Laubenheim had invested $5,500, owned 20,000 shares, and was worth $50,000; that Braniff had invested $2,500, owned 500 shares, and was worth $1,000,000; and that A. C. Hunt had invested $2,500, owned 500 shares, and was worth $75,000. Ernsberger had invested only $2,000; appellant had invested only $30,000; Janeway and Braniff had not invested anything and did not own any stock; and Laubenheim and Hunt had not invested anything and only owned some stock which had been given to them without cost. The application was denied. Similar statements were contained in a like application filed in Texas, and after

an extended hearing at which appellant was present, it also was denied. And kindred statements were contained in the application submitted to the Securities Commission of Oklahoma. It was stated in resolutions of the board of directors that quarterly dividends on shares of stock had been paid out of earnings or surplus and that such action was approved. Shares of preferred stock aggregating almost $800,000 were sold to more than 400 purchasers. The statements detailed, and others not set forth were severally false. The company did not have money in the East; its stock was not backed by bankers in New York; the money of the church was not invested in stock; Ernsberger had not given a check for $50,-000 for stock; there was no waiting list; and there was no earned surplus out of which dividends were paid. The dividends were paid out of money received for the sale of stock; the company was insolvent at all times after it acquired the Commercial Pipe Line Corporation; it was placed in receivership in January, 1932; and its continuous operating loss covering the entire period of its existence exceeded $108,-000, and its total loss was more than $189,-000. In résumé, using the methods reviewed, worthless stock was sold on an extensive scale, and the mails were used in connection therewith. The essence of the crime charged in the substantive counts on which appellant was found guilty is a scheme to defraud and the use of mails is in furtherance of it. Whether such a scheme was formed may be established by facts and circumstances and the reasonable inferences and deductions which fairly may be drawn from them. The essence of the offense laid in the conspiracy count is two or more persons combining with the intent and purpose of committing a public offense by doing an unlawful act or doing a lawful act in an unlawful manner. It is not essential to constitute the offense that the agreement be in any specified form or that any particular words be used. It is enough if the minds of the parties meet and unite in an understanding way to accomplish a common purpose. The evidence which the jury manifestly believed and its reasonable inferences went far beyond being as consistent with innocence as with guilt, and established a clear case of guilt.

█ Error is assigned upon certain parts of the cross-examination of appellant and other defendants. To illustrate, appellant and other defendants were asked repeatedly if they had heard named witnesses testify that salesmen made certain statements to them in connection with the sale of stock, and after the witness being cross-examined had answered in the affirmative, he was then asked whether the statements thus made by the salesmen were false. And the same question was frequently repeated with no apparent purpose other than emphasis. It was not even intimated that the statements of the salesmen were made in the presence of the defendant under cross-examination. The cross-examination did in some instances exceed what seems to be proper bounds. But in a long trial of this kind where intent is an element of the alleged offense and where a mass of factual detail is presented, the line of demarcation between proper and improper cross-examination frequently becomes narrow and shadowy and rests somewhat in the sound discretion of the trial court. It cannot be said from a careful examination of the record as a whole that the court erred to the prejudice of appellant in its determination of the bounds of proper cross-examination or in its choice of the point at which repetition should cease.

Certain rulings of the court in the admission and the exclusion of evidence are challenged. It is enough to say without going into detail that we have examined the questions with care and perceive no substantial error.

█ Complaint is made of the instruction to the jury that although the officers and directors of a corporation organized under the laws of the State of Delaware had a right to pay dividends out of surplus, still such payment "to be lawful and free from fraud, must be from a surplus honestly created and predicated upon an honest belief * * * but may not be paid in order to induce the public to purchase stock in the company by misleading and misrepresenting the financial soundness and stability of the company and if you find and believe from the evidence in this case * * * that the dividends * * * were paid to the investors for the purpose of creating a false design and impression of the stability and reliability of the company, then the payment of such dividends would be fraudulent representations. You may take this into consideration, together with all the other facts and circumstances, in determining whether or not there did exist a fraudulent scheme * * *." The argument is that the fact that such dividends

were lawfully paid should not have been emphasized as evidence of fraud on the part of appellant, and further that the payment of dividends should not have been singled out and emphasized as a possible badge of fraud. The payments were made under the advice of counsel, and they could have been made for an honest purpose and with an honest motive. But the instruction made it too clear for doubt or misunderstanding that such payments could not be considered as an indicia of a scheme to defraud or a conspiracy to use the mails in an unlawful manner unless the jury determined that they were made for the purpose of misleading and misrepresenting the financial soundness of the company. And there is no basis for the contention that undue emphasis was placed upon that part of the evidence.

▇▇▇ Stress is laid upon parts of the arguments made to the jury by counsel for the Government. It is said that it was inflammatory and prejudicial to refer to that which purchasers of stock not called as witnesses would have testified to, to intimate that money of the company had been embezzled for the reason that it was stipulated that no embezzlement occurred, to imply that certain character witnesses were paid or otherwise improperly influenced to give testimony and that in any trial character witnesses are a dime a dozen, and to suggest that regardless of the verdict the court had power to place appellant on probation or otherwise set him free. At one juncture counsel for appellant stated that at the proper time the court would be requested to instruct the jury concerning terms and matters used in the argument. At the conclusion of the closing argument of counsel for the Government in which he stated that in view of the overwhelming evidence which had been presented he believed a verdict of guilty would be returned, counsel for appellant excepted "to the last remarks", and counsel then moved the court to grant a mistrial on account of the intemperate, prejudicial and inflammatory argument of counsel. After the motion had been denied counsel requested the court to direct the jury to disregard such improper argument and the court stated that the matter would be covered in the general instructions. But no objection was interposed and no exception was taken at the time the arguments in question were made. The court did instruct the jury that it was proper for counsel to state in the course of argument their views, versions and conceptions of the facts and that much latitude was given them in doing so, that if counsel had used figures of speech or terms which seemed to exaggerate the facts the jury was not bound by them, and that such weight should be given to arguments as the jury saw fit, together with the facts and circumstances in the case. It is said however that the instruction was improper and failed to correct the error arising out of the objectionable arguments for the reason that instead of telling the jury to disregard such arguments, the court instructed in general terms that the jury was not bound by them, but no exception was taken to the instructions in that respect and no requested instruction was tendered. Attorneys for the Government are free to make earnest and vigorous argument to the jury, but they are not privileged to transgress recognized canons of propriety by endeavoring to arouse passion or prejudice. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314. Ordinarily, objection must be interposed at the time improper argument is made in order to preserve the question for review on appeal. But a court will correct the error in an aggravated case where it appears that the verdict was the result of passion aroused through extreme argument which plainly stirred resentment or aroused prejudice even though no objection was made at the time. New York Central R. Co. v. Johnson, 279 U.S. 310, 49 S.Ct. 300, 73 L. Ed. 706; Metropolitan Life Ins. Co. v. Banion, 10 Cir., 106 F.2d 561. Viewing the arguments as a whole, including the parts drawn in question, and taking into consideration the entire array of established facts and circumstances, it cannot be reasonably concluded that the challenged parts of the arguments may have unduly influenced the jury, affected their verdict, or brought about a miscarriage of justice.

▇▇▇ Even though argument by counsel for the Government is improper, where it appears from the entire record that the rights of the accused were not prejudiced—and that is the situation here—the error must be regarded as harmless. Berger v. United States, supra; United States v. Dubrin, 2 Cir., 93 F.2d 499, certiorari denied 303 U.S. 646, 58 S.Ct. 644, 82 L.Ed. 1107; United States v. Buckner, 2 Cir., 108 F.2d 921, certiorari denied, 60 S.Ct. 613, 84 L.Ed.——.

▇▇▇ Another rule has application to the closing argument. The arguments of coun-

sel for appellant and his co-defendants are not in the record. In ordinary circumstances a judgment will not be reversed for improper argument where all arguments are not in the record so that it can be ascertained whether the parts questioned were provoked or made in response to arguments of opposing counsel. Metropolitan Life Ins. Co. v. Banion, supra.

The judgment is affirmed.