**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**John A. KAYE, Defendant-Appellant.**

**No. 86, Docket 24612.**

United States Court of Appeals
Second Circuit.

Argued Dec. 2, 3, 1957.

Decided Jan. 17, 1958.

Writ of Certiorari Denied March 31, 1958.
See 78 S.Ct. 702.

Samuel J. Siegel, New York City, for defendant-appellant.

Paul W. Williams, U. S. Atty. for the Southern Dist. of New York, New York City (John H. Carroll, Sp. Asst. U. S. Atty., Robert Kirtland, Asst. U. S. Atty., New York City, of counsel), for plaintiff-appellee.

Before CLARK, Chief Judge, MOORE, Circuit Judge, and SMITH, District Judge.

J. JOSEPH SMITH, District Judge.

This is an appeal by John A. Kaye from a judgment of conviction entered in the United States District Court for the Southern District of New York on trial before Judge Palmieri and a jury, on a verdict of guilty on two counts, the first of violation of 18 U.S.C. § 479 by wilfully uttering with intent to defraud two counterfeit Kingdom of Belgium bonds, the second of conspiracy to violate 18 U.S.C. § 479 by negotiating 244 of the same counterfeit bonds. Kaye was sentenced to imprisonment for two years on each count, to run concurrently, and fined $2500 on the first count.

There was evidence that Kaye was a licensed securities broker who was acquainted with Evangelista (Evans), an ex-prize fighter. Evans in October of 1949 brought in to Kaye two counterfeit Kingdom of Belgium $1000 7% gold bonds of 1955. At Kaye's request his cashier obtained a quotation from Kaye's broker. The quotation was about 116½ ($1165 for a $1000 bond). Wheeler, employed at a bank, told by Kaye he had an opportunity to buy Belgium bonds below the market, warned Kaye to be careful about the sellers. Kaye told Wheeler they were European refugees. Earlier in the year Kaye had informed one Arthur Baum, president of First Guardian Securities Company, that he would like to arrange a loan for Better Products Company, using foreign bonds as collateral. The day after receiving the two bonds from Evans, Kaye, with Henry Winston, president of Super Electric Company, a company which First Guardian had been financing, had lunch with Baum and Baum's brother. Kaye proposed to Baum that First Guardian loan $150,000 to Better Products, Belgium 7's of 1955 to be used as collateral. It was proposed that part of the collateral loan be used to reduce Super Electric's indebtedness to First Guardian. Baum asked if Kaye's people would sell the bonds instead and Kaye said "yes." They agreed on a sale of 250 bonds of $1000 each, at a price of 60, or $600 a bond, plus $50 commission for Kaye per bond. Kaye attributed the low price to disagreement between the refugees, who had their money in Better Products and wanted to get out and Young, who he falsely said was an officer of Better Products. Kaye gave Baum one of the bonds, and later that day a second one, for which two bonds Baum paid Kaye $1200. Baum later that day sold the two bonds through a broker for $1120 each. On the following Saturday Baum came to Kaye's house

to close the deal. He paid $1200 cash for two more bonds and paid $7000 cash as down payment for the rest of the bonds to be delivered. After Evans, described by Kaye as Young's messenger, came to the house Kaye gave Baum a bundle containing 242 more bonds. Baum rejected two, one because it was coffee stained. Kaye explained that the refugees had smuggled the bonds out of Europe in coffee pots. Baum agreed to pay $50,000 in cash the following Monday, the balance in one week. That evening Kaye went to Baum's house in Riverdale and told Baum Young didn't want the bonds out over the week-end. Baum falsely represented he had delivered them to a customer in New Rochelle. Baum was willing to pay the balance of the purchase price. Checks were made out several different ways, finally as two checks to Kaye's order for $46,400 and $99,600. The checks were taken by Kaye out to two men in a car, who rejected them and came into the house. The two untidy and unkempt men were introduced by Kaye to Baum as Young's messengers, Lennie and Joe. After further negotiations at home and at a restaurant the 240 bonds were returned to Kaye, the deal to be completed the next day directly with Young. At that point Baum had given $7000 cash on the purchase of the 240 bonds to Kaye, of which $4000 had been turned over to Evans. Kaye gave Baum his own check for $4000 to insure Baum against loss of the $4000, and agreed to retain the other $3000 pending closing of the deal. Later he gave the $3000 to Evans. Sunday, the Baums were introduced to Young and arrangements made to complete the deal Monday. Monday before the time set for closing Baum checked a list of the bond numbers, which he had compiled without Kaye's knowledge, with J. P. Morgan & Company and learned that many of the bonds of those numbers had been redeemed and destroyed or cancelled. When he told Kaye this in Lennie's presence Kaye said the deal was off and told Lennie to go to Young and get Baum's money back. Lennie (co-defendant Berger) left and never returned. Kaye took

Baum to Young's office and was told by Young that Young actually had nothing to do with the bond deal. The investigation, indictment of Kaye, Evans, Berger and John Doe, the "Joe" of the negotiations, and conviction of Kaye, Evans and Berger followed. "Joe" had died in the meantime.

The principal ground of Kaye's attack on the judgment against him is a claimed insufficiency of evidence of Kaye's knowledge that the bonds were counterfeit. The evidence on this point, from which the jury could draw an inference of such knowledge, although circumstantial, was considerable. It included (1) the price at which Kaye was to, and did offer the bonds, $650 each when the market price was over $1100 each, (2) the source of the bonds, Evangelista (Evans) an ex-prize fighter who did not claim ownership, (3) Wheeler's warning to Kaye that they might be stolen, (4) Kaye's original efforts to place them as security for a loan where detection of their spurious nature might have been longer delayed, and later belief by Kaye that Baum was placing the bonds with a private buyer the butcher Buxbaum, where again the probability of prompt and careful checking of their genuineness would be slight, (5) the disreputable appearance of the messengers of the purported owner, (6) the misrepresentation by Kaye of Young's business and connection with the bonds, (7) the many contradictions in Kaye's pre-trial and trial statements, and (8) Kaye's unsatisfactory explanations of his actions. Kaye contends that this evidence failed to show knowledge the bonds were counterfeited rather than stolen. There was sufficient evidence to make this a question for the jury, for as the government points out, knowledge of counterfeiting is the more logical since Kaye would have expected so large a theft to have been widely known among dealers in securities, and Kaye had testified before the grand jury that he gave no thought to that possibility (theft), and that he knew they were not blocked assets. The issue of knowledge of counterfeiting was plainly

before the jury on the charge, and the jury's awareness and consideration of the issue are placed beyond doubt by the jury's request for additional instructions.

■ Testimony of an Atlantic City police officer of the apprehension of the defendant co-conspirator Berger hiding in a clothes closet of an Atlantic City apartment was received in evidence as against Berger alone. Testimony of the defendant co-conspirator Evans before the grand jury was admitted in evidence as against Evans alone. Defendant Kaye attacks as prejudicial to him the admission of evidence of Berger's flight and Evans' post-conspiracy statements. Proper instructions were given limiting the use of this testimony in the case against Berger only and Evans only respectively. In view of the limitation at the time of the admission of the evidence and in the charge, the denial of a mistrial on the ground of prejudice to Kaye was not error. Delli Paoli v. U. S., 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278. Indeed, in the case of evidence of Berger's flight the restriction of use of the testimony may not have been necessary. Lutwak v. U. S., 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593.

■ The defendant Kaye attempted to show that according to Moody's Manual of Investments the bonds had a high price of 120 and a low price of about 35 during the ten year period 1939 to 1949. The court sustained an objection to such evidence and denied a request that judicial notice be taken of the prices for the same period. These rulings, attacked on appeal, were clearly correct. The period covered by the proffered evidence, including the period of the German occupation of Belgium, covered times and circumstances too remote from the period of the alleged conspiracy, July-October 1949, to have any probative value on the issues in the case. The only prices material were the prices reasonably contemporaneous with Kaye's negotiations with the Baums.

■ Kaye contends that proof of the counterfeit nature of 240 of the bonds through circumstantial evidence was error. The counterfeit nature of the four bonds placed in evidence was directly proved. The jury was entitled to infer from the circumstances proved that the remaining 240 bonds were also counterfeit, 159 of them bearing numbers of bonds of that issue which had prior to that time been cancelled by perforation, as shown by business records kept in the normal course of business by the Belgium government's fiscal agent.

■ Kaye in his Request No. 19 asked the trial court to charge the jury that: "You must be satisfied beyond a reasonable doubt that the defendant Kaye had knowledge that the two bonds referred to in Count 1 were counterfeit at the time he gave them to Arthur Baum in order to find Kaye guilty under either count. You cannot apply any knowledge that Kaye may have received after Monday, October 24, 1949, retroactively to October 19 or 20." The charge of the court is attacked for failure to charge in the language of Request 19 and for failure to rule specifically on other requests, prior to the charge. It is not shown however to be defective in substance, Request 19 having been substantially covered, R. pp. 1128, 1129, 1147, 1158–60, 1168, 1169, 1177, 1180, and no prejudice is shown from failure to comply literally with Rule 30, Federal Rules of Criminal Procedure, 18 U.S.C. The court made it plain that knowledge of the counterfeit nature of the bonds at the time of the uttering was required for conviction, although it properly allowed later actions and statements of a defendant to be considered for what light they might throw on his state of mind at the critical time. The main and supplemental charges are full, complete and fair.

■ Finally Kaye contends that failure to provide a speedy trial, guaranteed by the Sixth Amendment to the Constitution of the United States, invalidates the conviction. More than seven years passed between arrest and trial, including some four and one half years between indictment and trial. The indictment was however found within the period of

limitations, no effort is shown to have been made by defendant to speed the trial, no prejudice is shown to have resulted to defendant, and no motion was made by defendant at the beginning of trial for dismissal because of delay. He may not now successfully attack the judgment on that ground. Worthington v. U. S., 7 Cir., 1 F.2d 154, certiorari denied 266 U.S. 626, 45 S.Ct. 125, 69 L.Ed. 475; Collins v. U. S., 9 Cir., 157 F.2d 409; Pietch v. U. S., 10 Cir., 110 F.2d 817, 129 A.L.R. 563, certiorari denied 310 U.S. 648, 60 S.Ct. 1100, 84 L.Ed. 1414; United States v. Stein, D.C.S.D.N.Y., 18 F.R.D. 17; United States v. Provoo, D.C.Md., 17 F.R.D. 183, 198.

The judgment is affirmed.