Eugene E. TURBERVILLE, Appellant,

v.

UNITED STATES of America, Appellee.

Bernard T. WILLIAMS, Appellant,

v.

UNITED STATES of America, Appellee.

James H. SIMPSON, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 16343, 16344, 16392.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 3, 1961.

Decided Feb. 1, 1962.

Petition for Rehearing En Banc in 16343 Denied En Banc March 19, 1962. Certiorari Denied June 25, 1962.

See 82 S.Ct. 1596.

Mr. Albert Noble McCartney, Washington, D. C. (appointed by this court), for appellant in No. 16343.

Mr. Joseph D. Bulman, Washington, D. C. (appointed by this court), for appellant in No. 16344.

Mr. John E. Powell, Washington, D. C. (appointed by this court), for appellant in No. 16392.

Mr. Donald S. Smith, Asst. U. S. Atty., with whom Mr. David C. Acheson, U. S. Atty., Mr. Charles T. Duncan, Principal Asst. U. S. Atty., and Mr. Thomas A. Flannery, Asst. U. S. Atty., were on the brief, for appellee. Mr. Abbott A. Leban,

Asst. U. S. Atty., also entered an appearance for appellee in No. 16344.

Before PRETTYMAN, WASHINGTON and BURGER, Circuit Judges.

PRETTYMAN, Circuit Judge.

On the evening of December 5, 1959, two men and a woman were sitting beside a fire in front of an unoccupied shack on a vacant lot in the Southwest section of Washington. Three men came upon the lot and launched a vicious assault upon them. As a result of the savage attacks, one of the men already on the lot, Ollie Bowman, was beaten to death; the second was beaten and burned; and the woman was raped, beaten and burned.

The appellants here, Turberville, Simpson and Williams, were arrested and indicted for first degree murder, felony murder, assault with intent to commit rape, assault with intent to commit mayhem, assault with a dangerous weapon, and mayhem.[1] They entered pleas of not guilty and were tried by jury. Each was convicted of second degree murder under the first degree murder count. Each was sentenced to life imprisonment with a minimum of fourteen years.[2] Their appeals were consolidated.

A total of fourteen points are raised. We shall discuss ten. We find the remaining contentions of error to be without merit.

1. Appellant Simpson says the evidence does not sustain his conviction of murder in the second degree. He relies upon the fact that no evidence was presented showing that he participated physically in the assault upon the deceased Bowman. Testimony showed that Turberville and Williams actually beat and kicked Bowman.[3] The prosecution was not required to make such an affirmative showing about Simpson, if he was properly charged as a principal under Section 105, Title 22, of the D. C. Code. That section provides in part: "In prosecutions for any criminal offense all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals and not as accessories, * *." The jury was instructed on that section. Under it, where defendants are charged as principals, the act of one defendant is the act of each.[4]

On the witness stand Simpson admitted that he was present at the affray, that he hit the man Lucas, and that he tried to have intercourse with the woman. The man Lucas testified that Simpson stuck burning sticks of wood in his eyes. Thus there is no doubt that Simpson participated actively in the assault on the two men Bowman and Lucas. The fact that the victim beaten by Turberville died and the man beaten by him (Simpson) did not, does not lessen Simpson's liability for advising, inciting, conniving, aiding or abetting in the homicide. The law on the point is well settled. As Wharton states it:

"All those who assemble themselves together with an intent to commit a wrongful act, the execution whereof makes probable in the nature of things a crime not specifically designed, but incidental to that

---

1. The indictment contained nine counts. Count 1 charged first degree murder, D.C.Code § 22–2401; Count 2, murder while perpetrating the crime of rape, D.C.Code § 22–2401; Count 3, murder while perpetrating the crime of mayhem, D.C.Code § 22–2401; Count 4, assault with intent to commit rape, D.C.Code § 22–501; Count 5, assault with a dangerous weapon, D.C.Code § 22–502; Counts 6 and 8, mayhem, D.C.Code § 22–506; Counts 7 and 9, assault with intent to commit mayhem, D.C.Code § 22–502.
Counts 2 and 3 were dismissed during the trial at the request of the prosecution.

2. Each was convicted and sentenced upon other counts.

3. Lucas testified that Turberville and Williams beat and kicked Bowman; Bunn also testified that Williams beat Bowman. The latter's death was the result of hemorrhage and shock due to ruptured viscera.

4. Polen v. United States, 41 App.D.C. 4 (D.C.Cir. 1913) (involving D.C.Code § 908 (1901), the earlier, identical version of § 22–105).

which was the object of the confederacy, are responsible for such incidental crime. * * * In such cases of confederacy all are responsible for the acts of each, if done in pursuance of, or as incidental to, the common design." [5]

The cases he cites go back to Hale's Pleas of the Crown. 1 Hale P.C. 439.

We conclude that the jury's verdict was amply supported by the evidence.

■ 2. Appellant Simpson argues that the trial judge erred in refusing to grant his motion for a directed verdict of acquittal by reason of insanity, and that the jury was not justified in finding that the Government had proved beyond a reasonable doubt that appellant was not suffering from a mental defect.

Simpson's insanity defense rested upon the results of two intelligence tests and the testimony of one of his public school teachers. In 1953, when he was fourteen years old, Simpson's score on a test administered to him by the Public School System of the District of Columbia showed that he had an I. Q. of 67 and a mental age of just over nine years. In 1958 he was rejected for military service because he scored in the lowest mental group on the Armed Forces Qualification Test.

The Moore [6] and Stewart [7] cases are urged upon us by the Government, but those cases are not applicable in the case at bar. In this case the issue was submitted to the jury; the points made by appellant concern his motion for a directed verdict and the sufficiency of the evidence to support the verdict.

When we have ordered directed verdicts it has been upon strong evidentiary grounds. In Douglas we pointed out that "Each case must be decided upon its own facts" [8] and that directing a verdict is "a duty to be performed with caution".[9] In Fielding we found a "strong showing of insanity made by the defense".[10] In Satterwhite [11] "substantial evidence established the basis for a reasonable inference that appellant had been suffering from severe mental disturbance on" the date of the offense. In Wright we pointed out that "Wright's showing of insanity, far from being merely 'some evidence' of insanity, is about as strong as can ever be made, unless the accused happens to have had a psychiatric examination immediately prior to his act." [12] We are of clear opinion that the testimony offered by Simpson was not sufficient to require a directed verdict.

Even if Simpson's evidence of low scores on intelligence tests were deemed to be sufficient to take the issue of insanity to the jury, the rebuttal testimony offered by the Government [13] clearly justified rejection of the defense by the jury.

■ 3. Simpson challenges as deficient the charge to the jury on the insanity issue. He claims that it dealt principally with the existence or non-exist-

---

5. 1 Wharton, Criminal Law § 258 (12th ed. 1932) ; and see id. § 251.

6. Moore v. United States, 107 U.S.App. D.C. 332, 277 F.2d 684 (1960).

7. See Stewart v. United States, 107 U.S. App.D.C. 159, 275 F.2d 617 (1960), rev'd on other grounds, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961).

8. Douglas v. United States, 99 U.S.App. D.C. 232, 239, 239 F.2d 52, 59 (1956).

9. Id. at 237, 239 F.2d at 57.

10. Fielding v. United States, 102 U.S.App. D.C. 167, 169, 251 F.2d 878, 880 (1957).

11. Satterwhite v. United States, 105 U.S. App.D.C. 398, 267 F.2d 675 (1959).

12. Wright v. United States, 102 U.S.App. D.C. 36, 41, 250 F.2d 4, 9 (1957).

13. The Government offered the testimony of Dr. David J. Owens, a psychiatrist on the staff at St. Elizabeths Hospital, to rebut the alleged insanity defense. Dr. Owens testified that his ninety-day observation and examination of Simpson led him to the diagnosis that Simpson had not been suffering from a mental disease or defect on the date of the crime. He stated that tests administered at St. Elizabeths revealed that Simpson was "suffering from borderline intelligence but not of sufficient degree of impairment to warrant diagnosis of mental defectiveness."

ence of "mental disease", when it should have emphasized "mental defect".

Assuming that Simpson was entitled to an instruction on insanity, the charge given was not defective. The trial judge repeatedly used the phrase "mental disease or defect". He employed terms such as "defective mental condition" and "mental abnormalities". We find no error in his definition of mental defect or in his references to mental defect when explaining the causality requirement and when instructing on the issue of burden of proof.

■ 4. All the appellants contend they were denied their constitutional right to a speedy trial.

Appellants were arrested on December 7 and 8, 1959. On January 25, 1960, Williams moved the court for a mental examination. On January 29th that motion was granted, and in the same order the case was continued to May 25, 1960.[14] On May 16, 1960, Turberville moved for a continuance on the grounds that his counsel was ill and that appellants were still undergoing mental examinations. The case was continued until October 10, 1960. Between this date and November 16, 1960, the date of the actual commencement of the jury trial, the prosecutor was granted three continuances to locate missing witnesses. There is no indication that appellants objected to any of these continuances; nor did they ever move for an immediate trial or contend that any of the various delays were "manufactured"; no prejudice appears to have

been wrought.[15] We think appellants' contention cannot be sustained.

■■ 5. In his closing argument to the jury, counsel for appellant Williams referred to the participation by the other two defendants in activities of Williams and urged the finding of the lesser included offense of second degree murder. Appellant Turberville contends that these statements ignored his persistent denials of participation in the commission of the alleged crimes and interfered with the impartial assertion of his plea of not guilty. Neither Williams nor Simpson makes this argument.

Surely it is not improper *per se* for defense counsel to urge the jury to return a lesser verdict than that charged in the indictment.[16] Furthermore counsel for Turberville failed to object at the trial to the closing remarks now in dispute.[17] The trial judge charged the jury that what counsel stated in their arguments did not constitute evidence and also instructed the jury to consider separately each crime charged in the indictment, and that the evidence applicable thereto should be considered "separately as to each defendant." Even were we to hold that the point is reviewable on appeal, we find it difficult to accept the contention that Turberville was prejudiced by an argument which was in essence a strong, and successful, plea against conviction of murder in the first degree and mandatory capital punishment. In the situation in which counsel then found their clients, pleas for convictions of lesser offenses would appear to have been sound tactics.

14. In that same order Simpson was also committed for examination pursuant to a motion by the prosecutor; in another order on that day reference is made to a motion by Simpson to the same purpose. On February 3rd Turberville moved for an examination, and the motion was granted February 12th.

15. Brooks v. United States, 110 U.S.App. D.C. 192, 290 F.2d 383 (D.C.Cir. 1961); James v. United States, 104 U.S.App.D.C. 263, 261 F.2d 381 (D.C.Cir. 1958), cert. denied, 359 U.S. 930, 79 S.Ct. 613, 3 L.Ed.2d 631 (1959); Pietch v. United States, 110 F.2d 817, 129 A.L.R. 563

(10th Cir.), cert. denied, 310 U.S. 648, 60 S.Ct. 1100, 84 L.Ed. 1414 (1940); Chinn v. United States, 228 F.2d 151 (4th Cir. 1955). See Beavers v. Haubert, 198 U.S. 77, 87, 25 S.Ct. 573, 49 L.Ed. 950 (1905).

16. See Clark v. United States, 104 U.S. App.D.C. 27, 259 F.2d 184 (D.C.Cir. 1958); Tatum v. United States, 88 U.S. App.D.C. 386, 392, 190 F.2d 612, 618 (D.C.Cir. 1951).

17. In this connection see United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 238-239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

**6.** Appellants Turberville and Simpson contend that the trial court erred in admitting evidence regarding what they consider to be the commission of a crime not charged in the indictment.

An examination of the facts surrounding what we shall term the "Tucker incident" is necessary to our disposition of the point. On the evening of the murder Turberville entered a drug-store near the scene of the alleged murder looking for one Tucker, a man who had apparently just struck a friend of Turberville. When an employee told Turberville that he did not know where Tucker was, Turberville announced that he was "going to get him" and left the store. What occurred next is not clear. At about the same time that evening, however, a man was seen being chased by Turberville, Williams, and another man on the vacant lot where the alleged murder occurred. It appears that Tucker shortly thereafter ran back into the drug-store and "laid down on the floor" crying, "They are going to get me." Turberville, carrying bricks, and Simpson, armed with a piece of wood, then entered the store. After the store manager had threatened to call the police, they left. As they left, Turberville said, "We are going to get him anyway." Appellants then approached Lucas, Bunn and Bowman on the vacant lot and asked if they had "seen a man pass". Bowman answered in the negative, and appellants then commenced the assault.

The well-settled rule which appellants seek to invoke is that upon the trial of an accused person evidence of another offense, wholly independent of the one charged, is inadmissible. However, as we stated in Bracey v. United States,[18] there are many well-established exceptions to this rule. We defined two of these exceptions as follows: "[E]vidence of other criminal acts has been held admissible by this court when they are so blended or connected with the one on trial as

that proof of one incidentally involves the other; [citing cases] or explains the circumstances thereof; [citing cases] * * *." [19]

We conclude from the record that the challenged testimony was admissible as within these exceptions to the general rule. In view of the proximity in time, place, and persons involved, and the close connection between the pursuit of Tucker, the subsequent inquiry of Bowman, and the ensuing assault, we cannot consider the Tucker incident, if indeed it involved any offense, to be an offense which should have been barred from the jury's consideration.

**7.** Appellant Simpson contends that two oral statements and a written statement which he made after arrest were admitted in evidence in violation of "the Mallory rule". [20]

Simpson was arrested at 11:20 p. m., on December 7, 1959. He was taken to police headquarters, arriving around midnight. Immediately thereafter the police began to question him about his alleged participation in the crimes. Within half an hour he made an oral statement implicating himself in the offenses. The officers testified that before he began this statement he was warned of his rights and told he did not have to make a statement; Simpson denied this. The written statement contains a recitation in accordance with the officers' testimony. The police began to reduce the statement to writing at 12:30 a. m. and completed the transcription at 1:25 a. m. Simpson then read and signed the statement. He was brought before a judge of the Municipal Court at 10:00 a. m. on the same morning. Thereafter, at approximately four o'clock that afternoon, two policemen went to the jail for the purpose of questioning the three defendants. Simpson then repeated his earlier incriminatory statement in the presence of Williams and Turberville.

---

18. 79 U.S.App.D.C. 23, 25, 142 F.2d 85, 87, cert. denied, 322 U.S. 762, 64 S.Ct. 1274, 88 L.Ed. 1589 (1944).

19. Id. at 26, 142 F.2d at 88.

20. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

We think that "unnecessary delay" within the meaning of Rule 5(a) and the Mallory case has not occurred when a defendant is arrested, brought to police headquarters around midnight, begins to make a statement within thirty minutes thereafter, and is then taken before a magistrate at 10 a. m. the same morning.[21]

Simpson's second inculpatory oral statement was made after he had been presented before the magistrate. Despite the dispute in the testimony as to whether Simpson was advised by the detectives of his rights before he signed the written statement, it is agreed that he was taken before a judge of the Municipal Court in open court, a lawyer was appointed for him, this attorney conferred with him, and the taking of testimony was then postponed. A detective present at the time testified flatly at first that Simpson was advised of his rights by the judge, but later said he could not remember precisely what was said. This testimony, with the denials by the accused, went to the jury upon the trial. In the absence of clear proof to the contrary we must in these circumstances give weight to the presumption that the judicial proceeding was regular and in accordance with the rules.

In this connection, however, and in our supervisory capacity over criminal proceedings in this jurisdiction, we admonish the judges of the Municipal Court that careful, precise compliance with the criminal rules, under which presentments and preliminary examinations in felony cases are conducted before judges of that court, and unmistakable records of such compliance in these cases, are in the interest of the administration of justice. Failure to comply with those rules is affirmatively detrimental to that administration, since it vitiates much that subsequently occurs. And failure to record compliance in some unmistakable fashion impedes that administration, because it throws these vital events into the realm of testimonial dispute. The requirements of Rule 5(b) are clear, precise and categorical. We should think that compliance in literal completeness would be a simple record for the courtroom clerk or the judge to keep in so important matters as these.

In the case at bar the trial court put to the jury the issues concerning the statements of Simpson made after his presentment to the magistrate. We think the evidence amply justified the submission.

Simpson urges us to adopt a rule that no statement made by an arrested person as the result of police interrogation may be admitted against him over objection. This, his counsel says, is the precise meaning of the Fifth Amendment. He refers to the elaborate discussion of the history and policy of the privilege by Professor Wigmore.[22] We are advised of no case which, up to now, has gone so far. The statement of Mr. Justice Douglas, in his concurring opinion in Reck v. Pate,[23] of his own view of what the rule ought to be, clearly shows that he would hold admissible statements made under detention if presentment is prompt, the accused is informed of his right to silence, and he is accorded an opportunity to consult counsel. We are not prepared even to approach the blanket rule of inadmissibility urged upon us by counsel for Simpson.

 8. After Simpson had made his second oral admission, in the presence of Williams, the police asked the latter

21. See Goldsmith v. United States, 107 U.S.App.D.C. 305, 277 F.2d 335 (D.C. Cir.), cert. denied, 364 U.S. 863, 81 S. Ct. 106, 5 L.Ed.2d 86 (1960); Heideman v. United States, 104 U.S.App.D.C. 128, 259 F.2d 943 (D.C.Cir. 1958), cert. denied, 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed.2d 767 (1959); Porter v. United States, 103 U.S.App.D.C. 385, 258 F. 2d 685 (D.C.Cir. 1958), cert. denied, 360 U.S. 906, 79 S.Ct. 1289, 3 L.Ed.2d 1257 (1959); Metoyer v. United States, 102 U.S.App.D.C. 62, 250 F.2d 30 (D.C.Cir. 1957).

22. 8 Wigmore, Evidence §§ 2250–2252 (McNaughton rev. 1961).

23. 367 U.S. 433, 448, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961).

whether he had anything to say. Williams answered in the affirmative and then proceeded to make an incriminatory statement. He now contends that this statement was improperly admitted in evidence at the trial because it was made after the committing magistrate had failed to comply with the requirements of Rule 5(b).[24] Williams testified at trial that the magistrate did not appoint counsel to represent him, or advise him of his right to refuse to make a statement, or that any statement might be used against him. Nor, it is claimed, was he told of the charge or that he was being held without bond. Williams was arrested about one o'clock, p. m., and was presented before the magistrate about 2:15 p. m. that same day.

The Government offered evidence which contradicted appellant's version of what had transpired in the Municipal Court. A Detective Pixton testified that during the presentment appellant was advised of his rights, informed of the charge, and allowed time to consult with his court-appointed counsel. The original complaint filed in the Municipal Court, which was admitted in evidence, reveals that an attorney was appointed by the judge and that bond was considered and appellant ordered held in no bond.

We think the trial judge was free to disbelieve Williams's testimony. The presumption of regularity which applies to judicial proceedings is applicable here. Appellant failed in his burden. Much of what we have said hereinabove in respect to Simpson's statements applies to Williams.

■■■■ 9. Simpson says the trial court erred in excusing for cause on the *voir dire* veniremen who answered affirmatively to the question whether they were opposed to capital punishment. What happened was simple and brief. The United States Attorney, addressing the panel, said: "Are any of you opposed to capital punishment, and, if so, stand?" He then addressed the question to each of eighteen prospective jurors, obviously those who stood in answer to his general question. Some of them said "Yes"; most of them stood silent, perhaps assenting with a nod; one answered "I think so"; one stated, "I am opposed to capital punishment." All were excused for cause, without further questioning. Thus the panel as it came to the drawing of the jurors for the case was without members who for any reason were opposed to capital punishment. Counsel for Simpson argues that he is entitled as of constitutional right to a jury drawn from a fair cross-section of the community. He cites the Glasser,[25] Thiel,[26] and Ballard[27] cases. A premise of his argument is, of course, that people opposed to capital punishment comprise a large segment of any cross-section of the community.

Dispositive of the contention is the fact that the point was not raised in the trial court. Nevertheless, since it is so earnestly pressed upon us by counsel, and since if a serious error has been committed we might note it *sua sponte*, we shall discuss it.

The process of selecting jurors in this jurisdiction is delineated quite specifically by statute.[28] A jury commission selects prospective jurors "from the different parts of the District, and * * * as nearly as may be, from its intelligent and upright residents." The commission writes the names on "separate and simi-

24. Fed.R.Crim.P. rule 5(b), 18 U.S.C.A., provides: "The commissioner shall inform the defendant of the complaint against him, of his right to retain counsel and of his right to have a preliminary examination. He shall also inform the defendant that he is not required to make a statement and that any statement made by him may be used against him. The commissioner shall allow the defendant reasonable time and opportunity to consult counsel and shall admit the defendant to bail as provided in these rules."

25. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

26. Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946).

27. Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946).

28. D.C.Code § 11–1401 et seq. (1961).

lar" pieces of paper, folds them, and puts them in a box. The box is sealed. Not less than six hundred names must be in the box when a drawing begins. Once a month the commission opens the box and draws by lot the names of such number of persons as are needed for jury service in the courts. The persons so drawn constitute a panel, or several panels. When a case is called for trial a panel is summoned and questioned upon subjects pertinent to qualification to serve in the particular case. The court excuses "for cause" such persons as it deems not qualified to render impartial judgment in the case. From the remaining persons the prosecution and the accused are entitled to excuse a certain number for any or no reason—"peremptory challenges". The end result is twelve persons seated as jurors. The system is discussed in Frazier v. United States.[29]

The point at which an accused is entitled to a fair cross-section of the community is when the names are put in the box from which the panels are drawn. Chance governs the next step. The panel drawn by lot may or may not be a cross-section of the community. No maneuvering or purposeful selection is permitted at that stage, lest the final twelve be by design of one or another thought or character. The rights of an accused in respect to the panel and the final jury are (1) that there be no systematic, intentional exclusion of any section of the community and (2) that there be left as fitted for service no biased or prejudiced person.

None of the cases cited by Simpson expresses a view contrary to the foregoing. Indeed in Thiel the Court after stating the rule as to a jury "drawn from a cross-section of the community", went on to say:

"This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter." [30]

Opposition to capital punishment may be for any one of a variety of reasons. They range from an unshakable religious conviction as stark as the Old Testament Commandment to a mere intellectual or philosophical distaste. Not all "opposition" to this penalty creates incompetence for jury service. So not all who are "opposed" to capital punishment are necessarily unqualified for service in a capital case. The nub of disqualification on this ground is whether the opposition is of such nature as to preclude an impartial judgment on the facts and the law of the case to be tried.

The situation is, then, that the trial judge in the case at bar may have excused more from the panel than he needed to excuse. But among those who remained were none who suffered on this account an impediment to proper service. What Simpson is really asserting is the right to have on the jury some who may be prejudiced in his favor—i. e., some who are opposed to one possible penalty with which he is faced. We think he has no such constitutional right. His right is to absolute impartiality.

The whole subject was thoroughly explored in an exhaustive, scholarly opinion by Circuit Judge Hincks, writing for a unanimous Second Circuit in United States v. Puff.[31] We need not here quote

---

29. 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187 (1948).

30. Supra note 26, 328 U.S. at 220, 66 S.Ct. at 985, 90 L.Ed. 1181.

31. 211 F.2d 171, cert. denied, 347 U.S. 963, 74 S.Ct. 713, 98 L.Ed. 1106 (1954).

from or attempt to summarize that discussion. We refer to it and rely upon it. The matter is made quite clear by a long series of authoritative pronouncements, beginning with Chief Justice Marshall's ruling in Burr's Trial[32] and including Reynolds v. United States,[33] Northern Pacific R. R. Co. v. Herbert,[34] Brown v. New Jersey,[35] Miles v. United States,[36] and Howard v. Kentucky.[37] In Shettel v. United States[38] this court (Groner, Justin Miller, and Vinson) said on the point:

"Moreover, while it is true, as appellant argues, that the Constitution guarantees to an accused the right to a speedy trial by an impartial jury, it does not follow that the rejection of qualified persons for insufficient cause would deprive appellant of that right; or that any useful or legitimate purpose would be served by remanding the case for a new trial before another impartial jury. It is significant in this respect, moreover, that no claim is made that the jury, as finally constituted, was biased or prejudiced; or that appellant was deprived of a trial by an impartial jury."

The Supreme Court, citing precedents, said in Logan v. United States,[39] decided seventy years ago:

"5. As the defendants were indicted and to be tried for a crime punishable with death, those jurors who stated on *voir dire* that they had 'conscientious scruples in regard to the infliction of the death penalty for crime' were rightly permitted to be challenged by the government for cause. A juror who has conscientious scruples on any subject, which prevent him from standing indifferent between the government and the accused, and from trying the case according to the law and the evidence, is not an impartial juror."

In Gillars v. United States[40] we held that a prospective juror who said she was opposed to capital punishment and did not believe she could render a fair and impartial verdict in the case was properly excused for cause. The touchstone in excuse for cause under the doctrine adopted by most courts is a conscientious scruple. This means something more than mere opposition. It means an opposition of such nature as to impede ability to render a fair and impartial verdict upon the law and the evidence as it develops in a given case.

Simpson's argument, as stated to us, is that the jury which tried him was not a fair cross section of the community, because it did not include any persons opposed to capital punishment. He makes no contention that the jury was prejudiced against him or that it was not impartial. However our own inquiry has brought to our attention another thesis in this area of the law. It is that persons who are not opposed to capital punishment are psychologically inclined against criminals and therefore a jury composed of such persons is not an impartial jury. We understand that this thesis has not as yet received the sanction of any court. We cannot accept it. We examine it because this is a serious case, and if the thesis were tenable it might cause reversal. No proof is available, so far as we know, and we can imagine none, to indicate that, generally speaking, persons not opposed to capital punishment are so bent in their hostility to criminals as to be incapable of rendering impartial verdicts on the law and the evidence in a capital case. Being not

32. 1 Burr's Tr. 416.

33. 98 U.S. 145, 154, 25 L.Ed. 244 (1878).

34. 116 U.S. 642, 646, 6 S.Ct. 590, 29 L. Ed. 755 (1886).

35. 175 U.S. 172, 175, 20 S.Ct. 77, 44 L.Ed. 119 (1899).

36. 103 U.S. 304, 310, 26 L.Ed. 481 (1880).

37. 200 U.S. 164, 173, 26 S.Ct. 189, 50 L. Ed. 421 (1906).

38. 72 App.D.C. 250, 252, 113 F.2d 34, 36 (1940).

39. 144 U.S. 263, 298, 12 S.Ct. 617, 36 L. Ed. 429 (1892).

40. 87 U.S.App.D.C. 16, 34, 182 F.2d 962, 980 (1950).

opposed to capital punishment is not synonymous with favoring it. Individuals may indeed be so prejudiced in respect to serious crimes that they cannot be impartial arbiters, but that extreme is not indicated by mere lack of opposition to capital punishment. The two antipathies can readily coexist; contrariwise either can exist without the other; and, indeed, neither may exist in a person. It seems clear enough to us that a person or a group of persons may not be opposed to capital punishment and at the same time may have no particular bias against any one criminal or, indeed, against criminals as a class; people, it seems to us, may be completely without a controlling conviction one way or the other on either subject. We think the premise for the thesis has no substance.

From all these considerations we conclude that the trial judge did not commit error when he excused all persons who opposed capital punishment. At the same time, in our supervisory capacity we urge upon the District Court that a better practice would be to proceed one more step in this questioning on *voir dire* to ascertain in general terms the weight of the opposition the juror entertains, when measured against his ability to render a fair and impartial verdict in the case on trial, based upon the evidence presented in that case and the law applicable thereto. We do not mean to suggest a prolonged inquiry, or any attempt to probe the mind and conscience of the person, which practice we condemned long ago in Funk v. United States.[41] We mean to suggest an additional question or two, sufficient to identify the nature and substance of the person's opposition; no farther, as we said in Funk, "than to ascertain the existence of this necessary want of bias or prejudice".

10. Appellants also urge that the trial judge was not qualified to sit in the District Court, having been appointed to sit in a legislative court and not in a constitutional court. We have rejected the contention in another case, pointing out that the District Court in this jurisdiction is an Article I court as well as an Article III court.[42] The point is before the Supreme Court.[43] We think the administration of justice requires that we not delay disposition of these appeals. We will, of course, entertain a motion for reconsideration and recall of mandate, if the Supreme Court rules this trial judge to be disqualified.

The judgments of the District Court are

Affirmed.

BURGER, Circuit Judge (concurring).

I concur fully in Judge PRETTY-MAN'S opinion. For emphasis I think it important to point up what I regard as implicit in this opinion concerning Simpson's case that evidence of a so-called "I.Q." rating which is low,[1] is not evidence of "mental disease or mental defect." We have held that such evidence does not warrant an instruction under Durham v. United States and later cases. See Moore v. United States, 107 U.S.App.D.C. 332, 277 F.2d 684 (1960). See also Fisher v. United States, 80 U.S.App.D.C. 96, 149 F.2d 28 (1945), aff'd, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946). Moreover, if such evidence be viewed as bearing on a so-called claim of "diminished responsibility" it should be remembered that this court, in an *en banc* hearing, rejected that theory as a defense claim in mitigation of punishment. Stewart v. United States, 107 U.S.App.D.C. 159, 275 F.2d 617 (1960), rev'd on other grounds, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961).

41. 16 App.D.C. 478, 489, cert. denied, 179 U.S. 683, 21 S.Ct. 916, 45 L.Ed. 385 (1900).

42. Lurk v. United States, 111 U.S.App. D.C. —, 296 F.2d 360 (1961).

43. Cert. granted, Lurk v. United States, 368 U.S. 815, 82 S.Ct. 110, 7 L.Ed.2d 23 (1961).

1. The defense relied on a score of 67 recorded in 1953 when Simpson was 14 years old, and his score in the Armed Forces Qualification Test.

Psychological intelligence testing is of highly dubious reliability for purposes of criminal law administration. In records which have come before this court we have noted wide variations in test scores when testing of the subject is under varying conditions or different supervision. For example in the very recent case of Jenkins v. United States, No. 16306, Oct. 26, 1961, —— U.S.App.D.C. ——, —— F.2d ——, in a battery of tests government psychologists at different times first recorded 63, then 74 for Jenkins on the I.Q. Section. A relatively short time later other staff members retested Jenkins and he scored 90. Psychiatrists are guided to some extent by tests given by psychologists but their use is as a diagnostic tool; their value for clinical purposes is established where they are subject to interpretation of trained psychiatrists. But it is quite another thing to expect a jury of laymen to interpret the meaning of such tests unless a trained psychiatrist has related it to a disease or defect covered by his medical diagnosis. See discussion of value of "intelligence tests" in Stewart v. United States, 107 U.S.App.D.C. at 162–163, 275 F.2d at 620–621.

WASHINGTON, Circuit Judge (concurring in the result).

I concur in the result, and in most of what Judge PRETTYMAN has written. As to point 9 of the majority opinion, dealing with the "capital punishment" question addressed to the jurors, my view is that since the matter was not raised at the trial, we need not and should not pass upon it here. The interests of justice do not require us to consider it, because a verdict of second degree murder was reached, and thus the extreme penalty was not in fact imposed, and because a prompt objection at trial would have offered the Government an opportunity to avoid any possibility of error by questioning the jurors more precisely as to their attitude on capital punishment. However, I do deem it appropriate and in the interest of good judicial administration to urge, as the majority opinion does, that such precise questioning should be the practice in future cases.